No. 23-16065

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TERADATA CORPORATION; TERADATA US, INC.; TERADATA OPERATIONS, INC.,

*Plaintiffs-Appellants*,

v.

SAP SE; SAP AMERICA, INC.; SAP LABS LLC,

*Defendants-Appellees*.

On Appeal from the United States District Court for the
Northern District of California, No. 3:18-cv-03670
Hon. William H. Orrick

# BRIEF OF *AMICUS CURIAE* MICROSOFT CORPORATION
# IN SUPPORT OF DEFENDANTS-APPELLEES'
# PETITION FOR REHEARING EN BANC

Aaron M. Panner
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
apanner@kellogghansen.com

*Counsel for Amicus Curiae*
*Microsoft Corporation*

February 3, 2025

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Microsoft Corporation states that it does not have a parent corporation and that no publicly held corporation holds 10% or more of its stock.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ...........................................................i

TABLE OF AUTHORITIES ................................................................... iii

INTEREST OF *AMICUS CURIAE* .........................................................1

STATEMENT AND SUMMARY OF ARGUMENT ............................................2

ARGUMENT ...................................................................................5

I.    The Panel's Conclusion That S/4HANA and HANA Are Not
      Technologically Integrated Is Incorrect...........................................5

II.   The Court Should Clarify That Software Design Decisions
      Challenged as Unlawful Tying Should Be Evaluated Under
      the Rule of Reason.........................................................................8

III.  The Panel's Decision Is Irreconcilable with This Court's
      Approach to Claims of "Predatory" Product Design....................................12

CONCLUSION ...............................................................................16

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

**CASES**

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
592 F.3d 991 (9th Cir. 2010) ............................................... 4-5, 12, 13, 14, 15

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752
(1984) ......................................................................................................11

*Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023),
*cert. denied*, 144 S. Ct. 681 & 682 (2024) .....................................3, 5, 6, 7, 8

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984) .........................8, 11

*Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984)...............................10

*Ohio v. Am. Express Co.*, 585 U.S. 529 (2018) ......................................................10

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370
(7th Cir. 1986) ...........................................................................................10

*Systemcare, Inc. v. Wang Labs. Corp.*, 117 F.3d 1137 (10th Cir. 1997)............. 9-10

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ......3, 5, 6, 7, 8, 9, 11

**STATUTES AND RULES**

Sherman Act, 15 U.S.C. § 1 *et seq.* ...............................................................4, 9, 14

§ 1, 15 U.S.C. § 1.....................................................................................9, 14

§ 2, 15 U.S.C. § 2.................................................................................4, 5, 14

Fed. R. App. P. 29(a)(4)(E).........................................................................................1

# INTEREST OF *AMICUS CURIAE*[1]

Microsoft Corporation ("Microsoft") is a leading innovator in computer software, hardware, and security features; it has been creating software platforms and an array of business applications for more than 40 years. Microsoft's mission is to enable individuals and businesses throughout the world to realize their full potential by creating technology that transforms the ways people work, play, and communicate. Microsoft develops, manufactures, licenses, sells, and supports a wide range of programs, devices, and services, including Windows, Microsoft Azure, Microsoft 365, Surface, Xbox and Xbox Game Pass, and Bing, in addition to a variety of commercial and enterprise technologies powered by artificial intelligence. Microsoft invests billions of dollars in the research and development of new technologies, products, and services to compete in dynamic markets.

Microsoft brings a unique and balanced perspective to the legal, economic, and technological issues in this case. As part of its business, Microsoft sells an array of platforms used by third-party developers; it also develops a variety of applications, sometimes in competition with third-party developers, some of which run on its own platforms and some of which run on platforms of competing

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), no counsel for any party to this appeal has authored this *amicus* brief, in whole or in part, nor has any party to this appeal or their respective counsel contributed money to fund the preparation or submission of this brief. All parties have consented to the filing of this brief.

software companies.  Microsoft accordingly has unique insight into both the importance of software innovation and the potential competitive concerns associated with leveraging of market power to foreclose competition.

The panel's determination that the software design at issue in this case is subject to scrutiny under the modified *per se* rule against tying is incorrect under existing law and, if allowed to stand, would chill efficient innovations that embody, rather than suppress, competition on the merits.  The threats of expanding litigation and imposition of liability for conduct that benefits consumers warrant rehearing.

## STATEMENT AND SUMMARY OF ARGUMENT

SAP released a suite of Enterprise Resource Planning ("ERP") applications – called S/4HANA – which it designed to work with SAP's own "translytic" database, HANA.[2]  S/4HANA cannot operate with other databases because it must rely on HANA to perform required calculations, and it is accordingly sold with the necessary "runtime" licenses to HANA.  These "runtime" licenses do not permit the user to employ HANA with third-party software (unlike less-restrictive "full-use" licenses, which users are not required to buy).

Teradata, which makes Enterprise Data Warehouse ("EDW") products, challenged this software design as an unlawful tying arrangement, claiming that

---

[2] All facts are based on the panel opinion.

2

SAP had unlawfully required buyers of S/4HANA (the claimed tying product) also to purchase certain analytical capabilities in HANA (the claimed tied product). The panel held that, if Teradata successfully proves that SAP has "market power" in a tying product market and that "the tying arrangement affects a not insubstantial volume of commerce in the tied product market," the challenged product design can be condemned as unlawful without any proof of harm to competition. Slip op. 24 (cleaned up). The panel held that this modified rule of "per se" illegality would apply because "the tying and the tied products here are not technologically or physically integrated." Slip op. 25.

The panel's decision, and the stated basis for it, are inconsistent with both this Court's prior decision in *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 681 & 682 (2024), and the decision that this Court expressly approved and adopted, *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc) (per curiam). The panel decision appears to be based on a misconception: S/4HANA and HANA are "technologically . . . integrated," just as the Internet Explorer Browser and Windows operating system at issue in *Microsoft* and app distribution and in-app payment functionality at issue in *Epic Games* were integrated. The panel should rehear the case to correct that error.

If the panel does not reconsider, the full Court should intervene. Broad application of a rule that allows for condemnation of product designs that require

3

products to operate in tandem – where they once operated separately – *without* proof of anticompetitive harm threatens to chill innovation that benefits consumers. The modified *per se* rule against tying seeks to protect against false condemnation through the dual requirement of tying-product market power and the separate-products test, which requires that the plaintiff establish distinct demand for the tying and tied products. For multiple reasons, however, these requirements do a poor job of limiting condemnation to those cases where tying is likely to harm consumers (and unlikely to benefit them), particularly in industries where rapid innovation may include reorganization of functions in new and more efficient ways. Application of the rule of reason, rather than the modified *per se* rule, to tying claims based on innovations in product design will help to forestall condemnation of innovations that are competitively benign or even beneficial, while affording defendants the opportunity to establish that any competitive impacts are justified by efficiency gains. If such proof is not required, companies will think twice before introducing efficient product designs that – under the panel's decision and reasoning – may not only invite burdensome litigation but threaten unjustified liability for consumer-benefiting innovations.

Such an approach is further justified by the rule that product-design decisions are rarely the basis for liability under Section 2 of the Sherman Act. *See Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991

(9th Cir. 2010).  In the Section 2 context, this Court has recognized that judicial scrutiny of product improvements can be at cross-purposes with the goals of antitrust law.  To be sure, the *Microsoft* court recognized that the mere fact that challenged conduct involves arrangement of software functionalities does not immunize such arrangements from scrutiny.  But the rule of reason appropriately permits the weighing of potential harms and benefits without categorically shielding potentially harmful tying arrangements.

## ARGUMENT

### I.   The Panel's Conclusion That S/4HANA and HANA Are Not Technologically Integrated Is Incorrect

In *Epic Games*, this Court adopted the holding of the D.C. Circuit in *Microsoft* that "*per se* condemnation is inappropriate for ties involving software that serves as a platform for third party applications."  67 F.4th at 997 (cleaned up). This Court also expressly embraced much of the reasoning of the earlier case.  It quoted the D.C. Circuit's observation that it lacked sufficient "'empirical evidence regarding the effect'" of such ties "'to exercise sensible judgment regarding that entire class of behavior.'"  *Id.* (quoting *Microsoft*, 253 F.3d at 94).  It also noted that the app-distribution and in-app-payment functionalities at issue in *Epic Games* were technologically integrated.  *See id.* at 997.  And this Court noted that the Supreme Court's separate-products test could not itself be depended on to "filter[]  out procompetitive bundles from *per se* scrutiny" because "[s]oftware markets are

5

highly innovative and feature short products lifetimes – with a constant process of bundling, unbundling, and rebundling of various functions." *Id.* at 997-98. "In such a market, any first-mover product risks being labeled a tie pursuant to the separate-products test. If *per se* condemnation were to follow, we could . . . dampen[] innovation and undermin[e] the very competitive process that antitrust law is meant to protect." *Id.* at 998 (citation omitted).

In this case, the panel acknowledged the holding of *Epic Games* but held that it did not apply to the bundling of S/4HANA with runtime licenses for HANA because "the tying and the tied products here are not technologically . . . integrated," noting that "HANA . . . is not a software functionality that is technologically . . . integrated with SAP's ERP application, but a standalone EDW product that SAP can and does sell independently of S/4HANA." Slip op. 25. That analysis ignores how these products operate. To be sure, SAP apparently sells HANA by itself, but S/4HANA depends on capabilities built into HANA and would be useless without it. In any case where there is a "tying" sale – that is, a sale of S/4HANA (the tying product) with a license to HANA (the tied product) – the products that are sold are technologically integrated in the relevant sense: the necessary functions depend on the interaction between S/4HANA and HANA.

This type of integration is of a piece with the type of integration at issue in both *Epic Games* and *Microsoft*:

In *Epic Games*, there was no evidence that Apple could not offer distribution of apps through the App Store without also requiring those apps to incorporate in-app purchasing functionality provided by Apple.  On the contrary, the evidence at trial was undisputed that Apple *did* permit developers to offer alternative payment functionality for physical goods and non-digital services (think Amazon or Uber).  Yet this Court properly concluded that the potential advantages of combining app distribution and payment processing in one "app-transaction platform[ ]" was sufficient reason to subject the tie to scrutiny under the rule of reason, *Epic Games*, 67 F.4th at 997 – a difference in standard that was dispositive of plaintiff's tying claim in that case.  *See id.* at 998 ("Applying the Rule of Reason to the tie involved here, it is clearly lawful.").

In *Microsoft*, the technological integration of the Internet Explorer browser and the Windows operating system involved "'shared' library files that perform [operating system] and browser functions with the very same lines of code." 253 F.3d at 87.  The integration here is analogous:  functions required by S/4HANA are part of HANA's code, not S/4HANA's code.  It is true that, in *Microsoft*, elements of the tied product (the browser) were incorporated into the tying product (the operating system), whereas, here, elements of the tying product (the ERP) are incorporated into the tied product (the database).  But if the panel thought this distinction made a difference, it did not say so, much less explain why – and no reason is apparent.

The holding of *Epic Games* applies here by its terms: HANA is software that can serve as a platform for developers, and the alleged tying arrangement at issue involves integration of software functions into the platform. The panel's reasons for nevertheless declining to apply *Epic Games* – and its rule-of-reason standard – are unclear and, in any event, mistaken. The panel should accordingly grant rehearing and correct its error.

## II. The Court Should Clarify That Software Design Decisions Challenged as Unlawful Tying Should Be Evaluated Under the Rule of Reason

Should the panel fail to act, the Court should grant the petition for rehearing en banc to make clear that tying claims based on software design decisions should be evaluated under the rule of reason – meaning that they should not be subject to condemnation in the absence of evidence of actual harm to competition in the tied-product market that is not justified by efficiencies. For reasons articulated by the en banc D.C. Circuit in *Microsoft* – and for additional reasons supported by economic scholarship – application of the modified *per se* rule to such claims risks discouraging the very innovation that antitrust rules are meant to encourage.

*First*, the "separate products" inquiry articulated by the Supreme Court in *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2 (1984) – which is intended to limit application of the *per se* rule to circumstances where tying is unlikely to offer significant efficiencies – carries a significant risk of false positives in innovative technology industries. *See Microsoft*, 253 F.3d at 88-89.

As the D.C. Circuit explained, the "separate products" inquiry – which depends on the existence of sufficient demand for purchase of the tied product separately from the tying product – is backward-looking; it therefore risks "preventing firms from integrating into their products new functionality previously provided by standalone products." *Id.* at 89. "If integration has efficiency benefits, these may be ignored by the *Jefferson Parish* proxies." *Id.*

*Second*, such efficiencies are far more likely to be jeopardized by overbroad application of the *per se* rule in high-technology industries than in traditional industries that were at issue when the *per se* rule was first formulated. The early Supreme Court cases on tying dealt with contractual restrictions. They did not address technological integration; they did not involve enhancements to the tying or tied products that increased the value of complementary goods; and any claimed benefits for users could be achieved by establishing standards for the tied product. *See id.* at 90. As the D.C. Circuit recognized, that context "affirmatively suggests that per se rules might stunt valuable innovation." *Id.* at 92.

*Third*, and more broadly, the *per se* rule against tying is difficult to reconcile with broader antitrust legal principles and economic scholarship. Although tying claims are pursued under Section 1 of the Sherman Act – with the tying sale generally treated as satisfying the Section 1 requirement of concerted action, *see, e.g., Systemcare, Inc. v. Wang Labs. Corp.*, 117 F.3d 1137, 1144-45 (10th Cir.

1997) (en banc) – tying conduct is substantively unilateral. There is no collusion, i.e., "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). Moreover, as this case illustrates, conduct challenged as tying may involve nothing but the defendant's unilateral choices regarding product design, marketing, and sales. As courts have recognized, rules that restrict firms from adopting efficient practices and competing vigorously, which by definition threatens rivals, harms consumers, who miss out on the benefits of lower prices and better products – not only from the defendant firm, but also from competitors driven to up their game. *See Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 375 (7th Cir. 1986). Application of the rule of reason, consistent with precedent, helps to avoid these problems.

In addition, as SAP argues, to the extent there is any agreement at issue, it is a vertical agreement; all such agreements – even where they are far more restrictive of competition than the sort of bundled sale at issue here – are subject to scrutiny under the rule of reason. *See Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018). By contrast, *per se* condemnation is properly reserved for *horizontal* restraints that enhance each colluding firms preexisting market power – like price-fixing, output restrictions, bid-rigging, and the like – which "deprive the marketplace of the independent centers of decisionmaking that competition

assumes and demands," *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768-69 (1984), and which lack redeeming virtues.

*Fourth*, economic scholarship calls into question the basic assumption underlying the *per se* rule against tying – namely, that such arrangements "serve hardly any purpose beyond the suppression of competition." *Jefferson Parish*, 466 U.S. at 34 (O'Connor, J., concurring in the judgment) (cleaned up). *Jefferson Parish* itself recognized that the assumption was mistaken. *See id.* at 11-12 (majority). In fact, tying is prevalent in competitive markets, reflecting the many benefits that offering two products together can provide to consumers. *See Microsoft*, 253 F.3d at 93 ("The ubiquity of bundling in competitive platform software markets should give courts reason to pause before condemning such behavior in less competitive markets."). Moreover, given the expansiveness of the *Jefferson Parish* "separate demand" inquiry, a competitor that has lost sales as the result of a change in product design that has rendered its own product obsolete or unattractive may have little difficulty in characterizing the new design as a suspect tying arrangement. Nearly any liability rule may entail a risk of false positives by condemning conduct that is benign or beneficial. But the *per se* rule against tying, particularly if applied in contexts for which it was not originally formulated, is especially poorly tailored to conduct that has a high likelihood of harm.

Applying rule-of-reason scrutiny to tying arrangements involving high-tech products strikes the right balance: it invites antitrust scrutiny when tying conduct harms competition but not otherwise, and it permits consideration of redeeming efficiences. To be sure, such an inquiry may raise litigation expenses in some circumstances, but those costs are likely to pale in comparison to the costs – to consumers, the proper focus of antitrust concern – of discouraging procompetitive innovations.

## III. The Panel's Decision Is Irreconcilable with This Court's Approach to Claims of "Predatory" Product Design

The panel's decision is at odds not only with this Court's prior treatment of tying cases but also with its cases holding that "a design change that improves a product by providing a new benefit to consumers does not violate Section 2 absent associated anticompetitive conduct." *Allied Orthopedic*, 592 F.3d at 998-99.

In *Allied Orthopedic*, the defendant ("Tyco") sold pulse oximetry systems, which comprise both sensors (attached to the patient) and monitors (separate devices that receive signals from the sensors). Tyco's "R-Cal" system was originally patent-protected – which prevented other manufacturers from making compatible sensors – but when the relevant patent expired, competitors began to sell such sensors, undercutting Tyco's price. In response, Tyco developed a new (also patent-protected) monitoring system, in which the sensors contained a digital memory chip; the monitors in the new system would not work with generic sensors

(although the new sensors worked with the old monitors, Tyco allegedly discontinued those).  Among other things, the plaintiffs claimed that Tyco had forced customers to purchase new monitors, which rendered generic sensors – that lacked digital memory chips – unusable.  The district court granted summary judgment; the plaintiffs appealed, arguing that the district court had erroneously failed to "balance the benefits of Tyco's alleged product improvement against its anticompetitive effects."  *Id.* at 998.

This Court affirmed, noting that, while "changes in product design are not immune from antitrust scrutiny," if a "design change is an improvement, it is necessarily tolerated by the antitrust laws, unless the monopolist abuses or leverages its monopoly power in some other way when introducing the product."  *Id.* at 998, 1000 (citation omitted).  The Court noted "the undesirability of having courts oversee product design" and the concern that "any dampening of technological innovation would be at cross-purposes with antitrust law."  *Id.* at 1000.  "To weigh the benefits of an improved product design against the resulting injuries to competitors is not just unwise, it is unadministrable."  *Id.*

The inclusion of a digital memory chip in the sensor "allow[ed] new functions, such as sensor event reporting and sensor messaging, to be included in the sensors themselves."  *Id.* at 1001.  Moreover, "even if Tyco has not yet been able to successfully utilize the new flexibility provided by the [new] platform, that in no way contradicts that the platform facilitates the introduction of new types of

sensors and sensor functions and will reduce costs for consumers in the long run."
*Id.*

This Court's reasoning in *Allied Orthopedic* should inform this Court's approach to "technological tying" cases like this one. The potential benefits of software innovations like those at issue here are comparable to the benefits at issue in *Allied Orthopedic*: including enhanced capabilities in a software platform may enable the development of more capable applications and more efficient data processing, all of which may reduce costs and enhance productivity. Such benefits are relevant to the antitrust calculus, and the defendant should have the opportunity to prove them.

It is true that *Allied Orthopedic* involved a monopolization claim under Section 2 of the Sherman Act, rather than a Section 1 tying claim, and this Court was careful to note that, if other conduct "constitutes an anticompetitive abuse or leverage of monopoly power," a defendant cannot avoid antitrust scrutiny simply by claiming that the conduct also involved an alleged product improvement. *Id.* at 1002. But the conduct at issue in *Allied Orthopedic* bears a close resemblance to the challenged conduct here: the *Allied Orthopedic* plaintiffs alleged that by incorporating new functionality into the new pulse oximetry sensors – analogous to the inclusion of analytical capabilities in HANA – Tyco was able to sell monitors that were dependent on those new capabilities, analogous to SAP's

sale of S/4HANA.  Just as the plaintiffs alleged that this reduced capability in the monitors forced the sale of the new, more capable sensors, plaintiffs here allege that sales of S/4HANA (which depends on analytical capabilities included in HANA) forced customers to purchase runtime licenses for HANA.  The panel's determination that the conduct at issue in this case may be the basis for antitrust liability *without* proof of actual harm to competition and *without* consideration of the benefits of SAP's alleged technological improvements is irreconcilable with the judicial deference that this Court endorsed in *Allied Orthopedic*.

In cases involving alleged technological tying, as in cases involving allegedly predatory design changes, antitrust enforcement creates a risk to procompetitive innovation by discouraging product improvements that benefit consumers while harming rivals.  The doctrinal gulf between the panel's approach and this Court's holding in *Allied Orthopedic* underscores the need for review by the full Court.

## CONCLUSION

The petition should be granted.

Respectfully submitted,

/s/ *Aaron M. Panner*

Aaron M. Panner
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
apanner@kellogghansen.com

*Counsel for Amicus Curiae*
*Microsoft Corporation*

February 3, 2025

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-16065

I am the attorney or self-represented party.

**This brief contains** 3,473 **words,** including [　] words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

　☐ it is a joint brief submitted by separately represented parties.

　☐ a party or parties are filing a single brief in response to multiple briefs.

　☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [　].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Aaron M. Panner **Date** 02/03/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form15instructions.pdf

**9th Cir. Case Number(s)** | 23-16065

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

Brief of Amicus Curiae Microsoft Corporation in Support of Defendants-Appellees' Petition for Rehearing En Banc.

**Signature** | /s/ Aaron M. Panner | **Date** | Feb 3, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 15**      *Rev. 12/01/2018*